**UNITED STATES of America, Plaintiff,**

v.

**Alvin Debois TURNER, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**William Earl JONES and Michael Joel Davis, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**Frederick BANKS, Defendant.**

Nos. CR 94–649 JSL, CR 94–820 JSL and CR 94–906 JSL.

United States District Court, C.D. California.

Oct. 12, 1995.

**1492**

Assistant U.S. Attorney, John Byrne, Jr., Los Angeles, CA, for the U.S.

Hector C. Perez, Newport Beach, CA, for Alvin Debois Turner.

Dwight B. Moore, Santa Ana, CA, for William Earl Jones.

Dean Gits, Overland & Gits, Santa Monica, CA, for Michael Joel Davis.

Michael J. Treman, Santa Barbara, CA, for Frederick Banks.

## ORDER AND OPINION GRANTING DEFENDANTS' MOTION FOR DISCOVERY RE SELECTIVE PROSECUTION

LETTS, District Judge.

Before the Court are the motions for discovery concerning alleged selective prosecution of defendants Alvin Debois Turner, William Earl Jones, Michael Joel Davis, and Frederick Banks. These motions were heard on September 27, 1995.

In deciding the motions, the Court need only determine whether the totality of the information presented (the "data") provides a colorable basis for concluding that prosecutorial decisions made by the U.S. Attorney with respect to cocaine base [1] offenses have discriminated against blacks. *United States v. Armstrong*, 48 F.3d 1508 (9th Cir.1995), establishes this "colorable basis" standard for permitting discovery on a motion for selective prosecution. If the data provides such a colorable basis, and if the requested discovery might shed further light on the issue, the motions must be granted. The motions may be properly denied only if no colorable basis arises from the data, or if the U.S. Attorney's explanation of the data dispels any such colorable basis. The Court finds that, even after considering all of the data, and all of the government's arguments based thereon, a colorable basis does exist.

Reduced to its essence, the dispute between the parties is simple. The U.S. Attorney asserts that it may focus its crack prosecution selections primarily on black persons identified by specific law enforcement agencies. These agencies concentrate their investigative efforts on members of black street gangs to reduce violent street crime. Defendants argue that no matter how laudable the objective of reducing violent street crime may be, it may not be pursued by prosecutorial selections that discriminate against blacks in this way.

Defendants argue that the U.S. Attorney's allegedly "race-neutral" criteria for deciding which crack offenders to prosecute are intentionally designed so as to dovetail with the objectives of specific law enforcement operations that target only black and minority gang members. The criteria used are weighted inconsistently so as to select blacks identified through investigations of street gangs—in particular to select those targeted in advance as the subject of law enforcement "sting" operations.[2]

---

1. Cocaine base, a derivative of cocaine powder, is commonly referred to as "crack cocaine" or simply as "crack."

2. A "sting" operation is one in which a government representative becomes a party to an illegal transaction for the sole purpose of arresting and prosecuting the other party. By definition, the decision of whom to "sting" precedes the offense, and rests upon grounds which need not be proved at trial. The legitimacy of convictions

The Court agrees. The U.S. Attorney acknowledges that reducing street violence is a major objective of its crack prosecutions. The data shows, *de facto*, that it is the *primary* objective. Over the period of time covered by the data, the vast majority of federal prosecutions have resulted from arrests made by various law enforcement operations that investigate "violent street gangs," and that target gang members for arrest and prosecution.

Over half of the prosecutions since 1992 have come from arrests made by one of these operations, the Los Angeles Federal Bureau of Investigation's Safe Streets Initiative (the "Initiative").[3] In 1994, the Initiative was responsible for 80% of all federal prosecutions in this district. All of the defendants now before the Court were arrested by the Initiative or by the Los Angeles Metropolitan Task Force on Violent Crimes ("LAMTFOVC"). LAMTFOVC is a multi-agency operation in which federal agencies, including the FBI, are actively involved. The Initiative and LAMTFOVC are referred to collectively herein as the "task forces." The task forces direct their activities to areas identified by law enforcement statistics as "high crime" areas. According to the data, all of these areas are populated almost exclusively by minorities. The government asserts that "violent street gangs" are primarily responsible for the level of criminal activity and that its investigating efforts concentrate on these gangs and their members.

The combined effort of all of the federal, state, and local law enforcement agencies operating in this district has failed to produce a single federal prosecution of a white crack offender, with only one dubious exception.[4] The U.S. Attorney's prosecutorial selection guidelines are weighted so heavily toward prosecution of gang members that if a white person and a black person were arrested for the same offense at the same time, the black suspect, if thought to be "associated with" a gang, would almost certainly meet all but one of the seven identified selection criteria. The white suspect would be likely to meet only one.[5]

The data does not indicate that the racial and ethnic mix of those prosecuted accurately reflects the racial and ethnic mix of actual users and distributors of crack. The U.S. Attorney must stand or fall, therefore, on its contentions that, as a matter of law, it is appropriate to focus crack prosecutorial decisions on black gang members perceived to be involved in street crime, and that the government does not have to provide any of the information upon which this perception rests. For the reasons expressed in this opinion, the Court believes that these contentions must fail, and that the defendants must be allowed the requested discovery.

## I. FACTS

These motions arise out of the prosecution of four defendants in three cases. The facts alleged reveal that the four defendants have more in common than the color of their skin. All four are alleged to be members of "violent street gangs." All were subjected to two or more task force "stings."[6] All were permitted to remain on the street after the first such "sting" sale. All were arrested only after being involved in a "sting" sale sufficient to trigger a mandatory minimum sentence of at least ten years. All of the "sting" sales in which any defendant participated involved purchase prices of less than $2,000. According to the Court's estimates,

---

based on sting operations is not in question. However, if the underlying law enforcement operations are designed so that "stings" will be directed only at blacks, the decision to prosecute only persons arrested pursuant to "stings" is unlawfully discriminatory.

3. The Initiative was established in January 1992, in response to an alleged increase in violent crime, particularly gang-related violent crime, by 371% between 1960 and 1993. Declaration of Ronald L. Iden at 2.

4. See discussion at pages 10–12.

5. See discussion of "gang membership" criterion at pages 16–18.

6. For example, Jones and Davis were subjected to five task force stings. The first involved the purchase of two grams of crack, the fifth a purchase of 52.9 grams. Government's Opposition to Defendants Jones and Davis' Motion to Compel Discovery Relating to Selective Prosecution at 21.

if tried and convicted, all the defendants face minimum sentences in excess of ten years—ranging from 135 months (for a first offense) to 25 years.

## II. ANALYSIS

### A. *The Legal Standard*

■ Although the government retains broad prosecutorial discretion, its discretion is not unfettered. It may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)). In *United States v. Armstrong,* 48 F.3d 1508, 1512 (9th Cir.1995), the Ninth Circuit gave particularized content to the limits set on prosecutorial discretion by *Wayte,* and supplied the legal standard to be applied in this case. Under *Armstrong,* to succeed on a claim for selective prosecution, a defendant must show both that the prosecutorial selection " 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' " *Id.* at 1513 (quoting *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531). Such a showing may be satisfied under "ordinary equal protection standards," *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531, pursuant to which evidence of discriminatory effects may support an inference of discriminatory intent. *Armstrong,* 48 F.3d at 1513.

■ The court in *Armstrong* also provided the legal standard for when discovery should be ordered for defendants seeking to claim discriminatory selective prosecution. Discovery may be ordered when the evidence provides "a colorable basis for believing that discriminatory prosecutorial selections have occurred." *Id.* at 1512. The colorable basis standard is met by "some evidence *tending* to show the essential elements of the claim."

*Id.* (quoting *United States v. Heidecke,* 900 F.2d 1155, 1159 (7th Cir.1990)).[7]

■ The Ninth Circuit also stated in *Armstrong* that statistical disparities alone may suffice to establish a *prima facie* case of selective prosecution. Accordingly, it held that "inadequately explained evidence of a significant statistical disparity in the race of those prosecuted suffices to show the colorable basis of discriminatory intent and effect that warrants discovery on a selective prosecution claim." *Id.* at 1513–14. The government must be provided an opportunity to explain the statistical disparity and "a colorable basis must still exist after all the evidence by both sides has been considered." *Id.* at 1516.

As applied to the issues presented here, the Court understands *Armstrong* to contemplate a two step analysis. First, the Court must consider the data presented by the parties concerning the racial make up of the defendants actually prosecuted in this district, to see whether it provides a colorable basis for concluding that discriminatory prosecutorial selections have occurred. Second, if the Court finds that the data raises a colorable basis, it must determine whether the government's explanation of the data, and of its selection process, persuasively dispels the defendants' showing of a colorable basis of selective prosecution.

### B. *The U.S. Attorney's Position*

The U.S. Attorney argues that all of its prosecutorial selections have resulted from consistent application of race-neutral selection guidelines. It urges that these guidelines "attempt, on the basis of quantity and aggravating factors, to identify defendants who deal in large quantities of drugs *or otherwise pose a threat of violence* and hence warrant the harsher penalties associated

---

**7.** To establish a colorable basis, a defendant must present specific facts and not mere allegations. *Id.* The court noted, however, that "judges considering discovery requests on selective prosecution charges should bear in mind the

evidentiary obstacles defendants face." *Id.* at 1514. Defendants are expected to provide only evidence that is already in their possession or that is readily available, and are not required to

with federal crack cocaine offenses" (emphasis added).[8]

This statement poses the issue squarely. It makes clear that prosecutorial decisions are *not* being made simply by reference to the seriousness of the charged offense, in the sense, for example, that a bank robbery involving a lot of money and the use of threats might be deemed more serious than a bank robbery that did not involve these factors. Instead, decisions are being made on the basis of criteria that identify individual *offenders*, rather than individual *offenses*, as being particularly worthy of prosecution.

In the Central District, federal law enforcement, led by the Initiative, concentrates its efforts on street gangs in the County of Los Angeles.[9] The government claims that this concentration is not racially based, but instead is premised on objective violent crime statistics and is shaped by the need for rational allocation of limited resources. "Violent" street gangs are targeted because the government perceives a high correlation between violent crime, gang activity, and crack trafficking.[10] The government argues that crack cocaine investigations are an important weapon in combatting the violent crime that it attributes to "violent street gangs" in these areas.[11]

The U.S. Attorney contends that its policy of combatting violent street crime by prosecuting gang members for crack offenses explains why its prosecution pattern is racially skewed. It argues that any allocation of law enforcement resources for crack prosecutions will inevitably result in the disproportionate concentration of resources in minority, inner-city communities.[12] Finally, the U.S. Attorney argues that individual examination of

each crack prosecution in the Central District demonstrates that its prosecutorial decisions are race-neutral.[13] All of these contentions reflect the government's underlying premise: that it may use its power to select the persons to be prosecuted for crack offenses so as to further other law enforcement objectives, rather than to separate more serious crack offenses from lesser offenses, even if the result is a serious racial imbalance among those selected for crack prosecution.

## C. The Court's Analysis

The Court's analysis follows the two-pronged approach that it deems to be required by *Armstrong*. First, the Court analyzes the data to determine whether it establishes a colorable basis for selective prosecution; and, second, finding that such a colorable basis exists in the data, the Court analyzes the U.S. Attorney's contention that there is a legitimate, non-discriminatory explanation for the data.

### 1. Statistical Evidence of a Colorable Basis

In *Armstrong*, the Ninth Circuit held that a colorable basis existed statistically based on substantially the same information provided by these defendants, primarily the Federal Public Defender's showing that 24 out of 24 defendants whom it had defended on crack charges in 1991 were black. In *Armstrong*, the government made no effort to demonstrate that the information presented was a statistical fluke or that any non-minorities were charged with crack cocaine offenses in federal court. *Armstrong*, 48 F.3d at 1515–19. The court held that, absent any

---

"to compile facts which are not easily obtainable by them." *Id.*

**8.** Government's Opposition to Defendants Jones and Davis' Motion for Specific Discovery Material at 5.

**9.** *See* Declaration of Iden at 3, 6–8.

**10.** According to the government, "gang experts" report that during the past ten years "gang-related" crime has increased more than 300 percent and "gang-related" homicides have increased more than 250 percent. *Id.* at 7.

**11.** *Id.* at 11.

**12.** *See* Declaration of Peter Reuter, Ph.D. at 2–3.

**13.** The government states that it has reviewed virtually every narcotics indictment or information filed by the office from January 1992 through March 1995. The government contends this review reveals that: (1) every crack case filed in 1992 and 1993 either met the applicable quantity guideline or involved firearms, (2) every crack case filed in 1994, except seven cases that involved eight defendants, either met the quantity guideline, involved firearms, or involved another drug offense, and (3) every crack case filed in 1995 met the quantity guideline.

such explanation, discovery would be warranted. *Id.* at 1519.

■ The government avoids the *stare decisis* effect of *Armstrong* by providing a more recent and comprehensive prosecution study than was provided in that case. This study covers all of the indictments or informations filed against defendants on crack-trafficking charges between January 1992 and March 1995.

The new study reveals that, of 149 defendants who were charged with crack-trafficking offenses during the relevant time period, 109 (74.7%) were black, twenty-eight (19.2%) were Hispanic, and eight (5.5%) were Asian. Three were unclassified.[14]

The data shows J.S. to be the only white person to have been charged with a crack offense in this district. J.S. was charged only after the selective prosecution motion in *Armstrong* had been filed and made public with the public defender's statistics included. Of the 149 defendants now shown in the data, J.S. was the last to be selected for prosecution. Had he not been included the number of whites prosecuted in this district would still have been zero. Like the four defendants here, J.S. was not selected because of the seriousness of the offense charged. He was selected in advance to be subjected to multiple "stings" culminating in a sale that met the minimum quantity for federal prosecution. The inference that these "stings" were done deliberately so that a white person could be selected for prosecution and included in subsequent prosecution statistics is almost irresistible.

Even with this single white defendant, however, the statistics still show a gross disparity between the number of blacks prosecuted for crack offenses and the numbers prosecuted among other racial groups. These statistics create a strong inference of discrimination. While this inference might be attacked by showing that the numbers correspond to the number of minorities and whites who participate in crack trafficking offenses, the data suggests the contrary.[15] In fact, the data shows that "blacks constitute a minority of the total number of crack cocaine users." [16]

The Court finds that the prosecution statistics, standing alone, establish more than is necessary for a colorable basis. The government has failed to respond with any evidence that undermines the legitimacy of the statistical inference of discrimination drawn from the pattern of prosecutions. The Court deems that if this data is not explained by race-neutral factors, then there is a colorable basis for finding discrimination. The Court must determine, therefore, whether the government has offered a legitimate, non-discriminatory explanation for the statistical evidence that negates the colorable basis of discrimination.

### 2. The Government's Race–Neutral Guidelines

■ The Court's conclusion that prosecutorial selections are being made to maximize the reduction in street crime, rather than on the basis of the seriousness of the charged offense, is not based on a single statement made by the government in one of its briefs. It is based on analysis of the crack prosecutorial guidelines themselves.

---

**14.** Supplemental Declaration of Daniel P. Collins at 3.

**15.** The data confirms that the percentage of occasional as well as frequent crack *users* that are white is substantially higher than the percentage of whites prosecuted for crack offenses in the Central District. *See* Declaration of Reuter at 3–6.

   The government has produced expert opinion testimony that crack cocaine *distribution* is disproportionally concentrated in poor urban communities and therefore defendants will more likely be black or members of other minority groups. *See* Declaration of Reuter. This opinion gives no explanation for why distribution would be gross-

ly disproportionate to use, however, and is unpersuasive.

**16.** *Id.* at 4–5. Although, it appears that the percentage of blacks is higher than the percentage of whites who use crack, this is not the relevant fact. What is relevant is not the percentage of each racial group that uses crack, but the percentage of all crack users that are in each racial group. According to a 1991 household survey, 52% of those reporting cocaine base *use* in the past year were white, 38% were black, and 10% were Hispanic. United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy, February 1995 at 38–39.

According to the government, the guidelines' primary charging criterion is the quantity of crack. The government also asserts, however, that it may decide to file federal charges based on the totality of the circumstances, even if the quantity guideline has not been met. The government takes into account the following factors: a defendant's prior record; the "dangerousness" of a defendant; a defendant's possession of information related to the investigation; a defendant's potential role as a witness; a defendant's membership or "association with" violent street gangs or other criminal organizations; a defendant's use or possession of a firearm in the offense; and "the nature of the underlying investigation, *e.g.*, a case might be charged that arose out of a special initiative by a federal law enforcement agency alone or as part of a combined federal/state/local task force." [17]

Analysis of these criteria shows that they almost incredibly coalesce with each other and with task force enforcement activities to produce a racially discriminatory pattern of prosecutions.

### a) *Quantity Guideline*

The U.S. Attorney urges that the quantity of crack involved is the primary criterion used in making prosecutorial selections, and that quantity is indisputably race-neutral. It relates specifically to the offense charged, and serves expressly to separate larger and more serious offenses that deserve to be prosecuted federally from those which are better left for state prosecution. Unfortunately, while this contention has surface appeal, it cannot withstand analysis. In many, if not most cases shown by the data it appears that the quantity criterion was relevant only for the purpose of assuring that the person prosecuted would receive a sentence of at least ten years.

During the period covered by the data, the minimum quantity that the government considered for federal prosecution was fifty grams. According to the government's information, a single sale of fifty grams of crack would represent between 100 and 500 user doses. The sale price in a fifty gram transaction would be about $1,000. [18]

The U.S. Attorney has given no reason to believe that $1,000 worth of crack is a quantity that can be made available for sale only by substantial crack traffickers. Indeed, it has not shown that 50 grams would represent more than the on-hand inventory of ordinary crack distributors on the street. It seems, in fact, that anyone predisposed to sell illegal drugs, even if never before involved in drug trafficking, might find it a simple matter to obtain that amount from sources readily available on the street. To anyone approached by someone offering to buy fifty grams of crack, therefore, the quantity has not been shown to represent an impediment.

It is clear that the crack quantity with which the defendants here were "stung" was not relevant to the decision to prosecute. The defendants were targeted in advance. The quantities were negotiated by the government to ensure that the people selected for the stings would be prosecuted federally, and would be sentenced to very long periods of incarceration. [19]

Nothing in the data suggests that anyone who was not suspected of being a gang member has ever been prosecuted federally for a crack offense anywhere near the minimum guideline quantity. The preponderance of task force-based prosecutions based on relatively small crack quantities, and particularly of the number of prosecutions resulting from task force "stings," suggests that the quantity criterion is used not to separate larger crack offenses from smaller ones, but rather to separate "gang-related" offenses from all others. Because gang membership is known to be race-related, the quantity criterion cannot be said to be race-neutral.

---

**17.** *See* Declaration of Eglash at 3–4.

**18.** Supplement to Government's Opposition to Defendants' Motions at 15.

**19.** The case of defendant Banks leaves very little doubt of this. Banks' first "sting" sale involved 82 grams of cocaine powder. Had he been arrested immediately, his *maximum* guideline sentence as a first time offender would have been 27 months. Instead, he was subjected to a second sting involving 81 grams of crack, for which his *minimum* guideline sentence is 135 months.

The Court is not suggesting that the U.S. Attorney has any responsibility for making sure that law enforcement operations are race-neutral, or that it must adopt prosecutorial selection guidelines designed to offset the effects of biases in the enforcement effort. Ignoring the effects of "stings," a prosecutorial decision to prosecute *all* offenses involving a set amount of crack might create no problem, even if the focus of law enforcement activities produced a racially skewed pattern of prosecution. The Court is suggesting that the U.S. Attorney cannot lawfully reinforce the discriminatory effects of law enforcement efforts that are targeted at blacks and minorities by applying sliding scale prosecutorial selection criteria so as to eliminate almost all but the products of those targeted efforts as candidates for prosecution.

As applied, it appears that the quantity and other selection guidelines have such an effect. The quantity guideline therefore cannot be considered race-neutral without regard to the underlying law enforcement operations that it tends to favor. The two are interdependent. If, as applied together, the selection guidelines operate so as to exclude almost all prosecutions of crack offenses except those committed by blacks thought to be associated with street gangs, it is the guidelines themselves that are biased, and the responsibility cannot be placed solely at the door of law enforcement.

### b) *Non-quantity based prosecutorial criteria*

The data makes clear that the importance of the quantity guideline varies depending upon what other factors may be present. Indeed, defendants who meet the other factors can be prosecuted for even amounts of crack below the quantity minimum.[20] If the other factors are not race-neutral, the quantity guideline offers little protection from discrimination. The Court must examine, therefore, whether these criteria are race-neutral.

### (i) *Gang membership*

Although the government lists membership in or "association with" a violent street gang as one of many selection factors, the data makes clear that this is the dominant factor in actual decision making. Most of the other factors are proxies for gang membership. Law enforcement efforts, such as the Initiative, assume a correlation between gangs and street crime. The U.S. Attorney's prosecution guidelines reflect the same assumption. Upon analysis, the only criterion used in the process of crack prosecution selection that does not follow directly from gang-membership is possession of a firearm. Possession of a firearm is race-neutral; gang membership clearly is not. Even if he does not possess a firearm, an arrested member of a gang that law enforcement has deemed "violent" will meet, almost by definition, five of the other six selection criteria: 1) membership or association with a violent street gang, 2) suspected "dangerousness," 3) involvement in an arrest that arose out of a special initiative involving a federal law enforcement agency, 4) possession of information related to the investigation of his gang, and 5) potential as a witness.[21] Moreover, as discussed below, the defendant's prior criminal record, the remaining criterion, also may be significantly affected both by suspected gang association, and by the mere fact of being black.

The fact that so many of the selection criteria follow almost automatically from gang membership creates racial bias in the prosecutorial selections. Because the task force investigations involve primarily black gangs, those who are identified by task forces as gang members must also be primarily black. There is no evidence that a white gang has ever been targeted for investigation or that a white person has ever been identified as a violent gang member.

Using unsubstantiated law enforcement allegations that defendants have an "association with" "violent street gangs" raises numerous problems as the dominant criterion for prosecutorial selection. Surely the criteria by which law enforcement deems it ap-

---

**20.** Declaration of Eglash at 3.

**21.** *See* Declaration of Eglash at 3–4.

propriate to make such an allegation deserve to be examined. How are people identified as gang members? What does it mean to be "associated with" a gang? Is it enough just to talk to gang members? Is it enough if one also turns his hat around and wears baggy clothes? Might it be enough in rare cases just to be black and disrespectful to the wrong police officer?

The task forces that arrested the defendants here were already investigating the specific gangs of which the defendants are alleged members. The government characterizes these gangs as "large-scale drug organization[s] responsible for gang-related drug trafficking and violence in Los Angeles." [22]

The government has not explained adequately how or why the particular gangs to which it claims that these defendants belong are labeled "violent street gangs" or "criminal organizations;" how crimes are attributed to specific gangs; how the crimes allegedly committed by the gang members are determined to be "gang-related;" [23] and how it determined that these gangs are involved in a disproportionate number of drug trafficking and violent crimes. Without independent data showing these connections, the Court believes that serious constitutional questions are raised as to whether the government legitimately may target an associational group merely because law enforcement believes that these groups are the cause of violence and drug trafficking in certain areas of Los Angeles.

### (ii) Defendant's Criminal Record

The defendant's prior criminal record is a legitimate selection criterion. It reflects criminal acts that have either been admitted or proven to a jury beyond reasonable doubt. In the first instance, at least, it does not follow automatically from gang membership. Still, it must be scrutinized carefully in the present context.

One of the most disturbing criminal statistics that has come to light in recent years is that almost one in four black males in the United States between the ages of twenty and twenty-nine is under the control of the criminal justice system. [24] A study has indicated that seventy-five percent of black males in Washington, D.C. will have a criminal record by the time they are thirty-five, and eighty to ninety percent will have a criminal record before they die. [25] This suggests that in an even larger city like Los Angeles, it is likely that any black youth in the areas targeted by law enforcement will have a criminal record. This is especially true of those who may be "associated with" a black street gang in an area in which law enforcement has been targeting over a considerable period of time.

A California study revealed that ninety-two percent of the black men arrested by police on drug charges were subsequently released for lack of evidence or for inadmissible evidence. [26] This number is far too large to be attributed to police incompetence. The most logical explanation is that arrests are

22. Government's Opposition to Defendant Turner's Motion at 1 (referring to the Project Crips); Government's Opposition to Defendants Jones and Davis' Motion at 3 (referring to the Venice Shoreline Crips); and Government's Opposition to Defendant Banks' Motion at 3 (referring to the Project Crips).

23. Until 1989, for example, the Los Angeles Police and Sheriff Departments counted as "gang homicides" all those homicides that involved someone somehow identified as a gang member, whether the individual was the perpetrator or the victim. Joan Moore, *Gangs, Drugs, and Violence* in GANGS 160, 162 (Scott Cummings and Daniel J. Monti, eds., 1993). These classifications did not take into account whether the motivation for the homicides was related to gangs.

24. MARC MAUER, THE SENTENCING PROJECT, YOUNG BLACK MEN AND THE CRIMINAL JUSTICE SYSTEM: A GROWING NATIONAL PROBLEM 3 (1990). The comparable figure for whites is one in 25. *Id.* While African–American men make up six percent of the population, they are 47 percent of the prison population. *Young Black Men*, N.Y. TIMES, May 7, 1992, at A26. Nationally, more black men are imprisoned than enrolled in college (in 1992, 583,000 compared to 537,000, respectively).

25. JEROME G. MILLER, NATIONAL CENTER ON INSTITUTIONS AND ALTERNATIVES, HOBBLING A GENERATION: YOUNG AFRICAN AMERICAN MALES IN WASHINGTON, D.C.'S CRIMINAL JUSTICE SYSTEM (1992).

26. Jerome G. Miller, *From Social Safety Net to Dragnet: African American Males in the Criminal Justice System*, 51 WASH. & LEE L.REV. 479, 488–489 (1994).

being used extensively for purposes other than to bring suspected black drug offenders to justice by trial and conviction. Particularly when the data contains a suggestion that the U.S. Attorney may place substantial weight on arrest records of black gang members rather than convictions, the race-neutrality of this criterion, as applied, is open to serious question.

Defendant Banks is an example. Banks is an alleged gang member. He has been arrested seven times, but has never been convicted. Having failed to prove that Banks committed any of the offenses for which he was arrested, the government asserts that it decided to prosecute Banks federally after a "sting" arrest because he had "multiple arrests, including arrests for crimes involving narcotics and violence." [27] In its opposition papers, the government now labels Banks as a "confessed violent [28] member of the Four–Trey Crips." [29]

### (iii) Possession of Information Relating to the Investigation

The last prosecutorial criterion advanced by the government that deserves special comment is the defendant's possession of information relating to the investigation that led to the arrest. On its face, this criterion has no legitimate connection to the alleged crime committed by the defendant. It identifies those defendants whom the government suspects may be of help in prosecuting other individuals. Since the majority of persons prosecuted for crack are arrested by task forces that target violent street gangs, this criterion most often identifies defendants who are suspected of having information about their gang. Suspected gang members meet this criterion based on that suspicion alone. Others must meet it, if at all, in some other way.

The overwhelming majority of those who meet other criteria for federal prosecution are black or minority group members. It follows inevitably that their coerced cooperation will lead to the arrest and prosecution of other black or minority group members. As a result, the cooperation criterion aggravates rather than mitigates the racial and ethnic imbalance of prosecutions for crack offenses.

It is probable that those "associated with" gangs who may be the most willing to cooperate with the government in its investigations, are those who have the weakest ties to the gangs. If discovery reveals that the government is, in fact, primarily targeting such people for sting operations, it is very likely that application of the guidelines creates some very perverse results.

For example, consider a situation in which a black courier was stung and arrested along with a white crack dealer. The courier would have been selected because of his perceived potential for cooperation. He would meet virtually all of the prosecutorial guidelines. He would be submitted for federal prosecution so that the severe mandatory minimum sentence could be used to leverage his cooperation. The white crack dealer might well be considered as excess baggage, and never even be submitted for federal prosecution. If the courier failed, or was unable, to cooperate, he would receive a ten year sentence, while both the white dealer and the intended buyer would remain free. To suggest that the courier's real offense was acting as a courier, rather than refusing to cooperate, is to ignore the substance of what happened in favor of the thinnest veil of form.

### CONCLUSION

Before Congress enacted the sentencing guidelines, individuals in this country could

---

27. Government's Opposition to Defendant Banks' Motion at 17.

28. The Court assumes that if Banks confessed anything, it was that he was a member of a gang which the government deems to be "violent," rather than that he is a "violent member" of the gang.

29. *Id.* at 3. That he would be so represented to the Court, when never convicted of anything, raises serious questions about why he has been

arrested so often in the past, without the ability to obtain a conviction, and why he was targeted for the sting which led to this indictment. Was he arrested because he was a gang member who was particularly disliked by law enforcement? Was he subjected to a "sting" because despite so many arrests he had never been convicted? Whatever the reasons, because he sold less than $2,000 worth of crack to a government agent, it appears that he will face a sentence of 135 months for his first offense of conviction.

be deprived of their liberty only on the basis of facts proven to a jury beyond reasonable doubt, and only by a judge who had considered the totality of the circumstances surrounding their individual offenses. In less than fifteen years, these protections have been almost entirely stripped away. By its own decisions upholding the sentencing guidelines and other mandatory minimum sentencing statutes, the judiciary has abdicated its historic responsibility for criminal sentencing. In doing so, the judiciary has allowed Congress to deprive individuals of their liberty for periods of time, up to life imprisonment, based almost entirely on facts never submitted to a jury, and never proven beyond reasonable doubt to anyone. The judiciary has also freed Congress to mandate the imposition of extraordinarily severe sentences for crimes so common that there is no real hope of prosecuting and convicting all who commit them.

The government now urges that the judiciary has also freed the U.S. Attorney to select which offenders of common crimes will be prosecuted and subjected to severe sentences based on facts never told to the defendants nor proven to anyone according to any defined legal standard. According to the U.S. Attorney's Office, it is free to select among those who might be prosecuted for crack offenses based on the unsupported allegations of law enforcement officers about the character of the offender rather than the character of the offense.

There is no reason to believe that the U.S. Attorney's Office tests the accuracy and veracity of the allegations made by law enforcement officers at all, much less in any way comparable to the way in which it tests the accuracy and veracity of allegations which will have to be repeated from the witness stand. If it does not have any procedure for verifying the allegations, the real decisions about whom to prosecute for crack offenses, what reasons support prosecution, and for how long offenders will be incarcerated, are being made not by juries, judges, or even by the U.S. Attorney, but rather by law enforcement officers on the streets.

The Court finds before it four defendants who were stung and charged with crack offenses. In every meaningful sense, these defendants are to be deprived of their liberty for eleven to twenty-five years not because they committed the charged offense, but because law enforcement officers want them incarcerated for other reasons. The offense with which they are charged is a mere pretext that government representatives manipulated in order to meet the prosecutorial guidelines. If these defendants had been white persons engaged in the same criminal activities, they would not have been suspected of any gang association, they would not have been stung by the government to increase the penalty for the offense, and they would not have been selected by the U.S. Attorney for prosecution. They would not be here today. Their real offense is alleged gang association, not the crack offenses with which they are charged.

The government asserts that its determination as to whether the objectives it pursues through crack prosecutions are legitimate, and as to whether a prosecution furthers those objectives, cannot be questioned. It asserts that no matter how racially biased the results of its selection process may be, no matter how clear it is that the law enforcement operations that produce the vast majority of its prosecutions can produce only black candidates for prosecution, and no matter how dubious the information may be that supports the claim that an individual defendant meets the selection criteria, its word is final. According to the government, individual defendants have no right to know the information on which the selection was based, no right to test it for accuracy, and no right to seek review.

The Court cannot agree. While the Court does not maintain that all of the inferences made in this opinion are necessarily true, the Court finds that discovery must be ordered. Because the government has not contested the breadth of any of the discovery motions, the motions must be and are hereby GRANTED as made, and discovery is hereby ordered in accordance therewith.

IT IS SO ORDERED.